# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00060-CR

**Juan Ortiz, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 426TH JUDICIAL DISTRICT
### NO. 73483, HONORABLE FANCY H. JEZEK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Juan Ortiz of intoxication manslaughter, *see* Tex. Penal Code § 49.08; found that he had used or exhibited a deadly weapon in the commission of the offense, *see id*. § 1.07(17) (defining "deadly weapon"); and assessed his punishment at confinement for seventeen years in the Institutional Division of the Texas Department of Criminal Justice. In two issues, appellant complains about the trial court's denial of his request for the appointment of an expert and the admission of evidence regarding the average elimination rate of alcohol. Finding no reversible error, we affirm.

## BACKGROUND[1]

The evidence at trial concerning what happened was largely undisputed. Appellant spent much of the evening on June 6, 2014, at a bar where Ashley Pekarek worked. Around 2:00 a.m. on June 7, 2014, appellant drove away from the bar on his motorcycle with Pekarek as a passenger. A short time later, appellant began driving the wrong way on a highway and then had a head-on collision with another vehicle. Both appellant and Pekarek were seriously injured in the accident and transported by helicopters to a hospital. Pekarek had no pulse when she arrived at the hospital and died from the "blunt force injuries" that she suffered in the accident. Appellant, who was wearing a helmet at the time of the accident, did not suffer a concussion but broke his leg. During the flight transporting appellant to the hospital, appellant was given "50 micrograms of fentanyl, which is a pain medication," and fluid that is known as "Lactated Ringer's solution." Before receiving medication in the emergency room and approximately one hour after the accident, appellant's blood was drawn and then tested for its blood alcohol concentration. The results of the test showed alcohol of "218 milligrams per deciliter," which, according to expert testimony, translated to a blood alcohol concentration of 0.18.

In October 2014, appellant was charged by indictment with the offense of intoxication manslaughter and appointed counsel. In October 2015, the State gave appellant notice that the State would seek an affirmative finding that during the commission of the offense that appellant "did then

---

[1] Because the parties are familiar with the facts of the case, its procedural history, and the evidence adduced at trial, we provide only a general overview of the facts of the case here. We provide additional facts in the opinion as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.1, 47.4. The facts recited are taken from the testimony and other evidence presented at trial.

2

and there use and exhibit a deadly weapon, to-wit: a vehicle." Around the same time, the trial court granted appellant's ex parte motions for the appointment of experts, including an expert who was a forensic toxicologist, to assist in the defense's investigation and preparation for trial.

Shortly before the jury trial occurred in January 2016, appellant sought a continuance based on notification from the prosecutor that one of the State's experts had "found some pre-admittance [medical] records" showing that appellant was given fluids and "50 micrograms of fentanyl" while being transported to the hospital. Appellant argued that he needed more time to consult with an expert concerning these records. Following a hearing, the trial court denied the motion. The trial court also held an ex parte hearing during trial to address appellant's request to obtain a particular expert in forensic toxicology to evaluate the pre-admittance records. The trial court denied appellant's request for this particular expert.

The State presented evidence at trial to support its theories that, at the time of the accident, appellant was intoxicated because he did not have "the normal use of mental or physical faculties by reason of the introduction of alcohol" and had "an alcohol concentration of 0.08 or more." *See* Tex. Penal Code § 49.01(2) (defining "intoxicated"). The State's witnesses at trial included: (i) responding officers and other emergency medical personnel who were at the scene of the accident; (ii) a physician and a nurse who treated appellant in the emergency room; (iii) the chief of clinical chemistry at the hospital; (iv) numerous individuals who witnessed appellant, including when he was at the bar drinking alcohol, on his motorcycle driving away from the bar carrying Pekarek as a passenger, on his motorcycle going the wrong way on the highway, and at the scene of the accident; (v) the driver of the other vehicle involved in the head-on collision; and (vi) experts—a

3

forensic scientist and a forensic pathologist. The State's exhibits included audio recordings of 9-1-1 calls from individuals who either witnessed appellant driving the wrong way on the highway prior to the accident or who were at the scene of the accident, videos and photographs from the scene of the accident, and the laboratory results from the testing of appellant's blood at the hospital.

The defense's theory was that the State did not meet its burden to prove that appellant was intoxicated at the time of the accident. The defense challenged the adequacy of the police investigation, the authenticity and accuracy of the hospital's blood alcohol test results, and the accuracy and credibility of witness testimony about the amount of alcohol that appellant consumed in the hours immediately before the accident and signs of intoxication that he exhibited during that time period. The defense focused on appellant's ability to operate his motorcycle, including maintaining the balance necessary to ride it. The defense's witnesses included an agent from the Texas Alcoholic Beverage Commission who was involved in a related administrative investigation, an emergency medical technician who was at the scene of the accident, and the flight nurse who was on the helicopter that transported appellant from the scene of the accident to the hospital. The defense did not call an expert.

The jury found appellant guilty as charged in the indictment and that he had used or exhibited a deadly weapon in the commission of the offense. The same jury assessed his punishment at confinement for seventeen years. This appeal followed.

ANALYSIS

**Appointment of Expert**

In his first issue, appellant argues that the trial court abused its discretion and denied him due process by denying his request for the appointment of an expert after the State notified him that it intended to offer medical records from the air ambulance that transported him to the hospital. Because the records showed that he was given fentanyl and "Lactated Ringer's solution" during the helicopter flight to the hospital, appellant contends that an expert—specifically a forensic toxicologist—was needed to determine whether the pain medication or fluid affected him or the blood alcohol test results, which was a "critical issue at trial."

"[D]ue process may require that an indigent defendant be granted access to expert assistance if 'the expert can provide assistance which is "likely to be a significant factor" at trial.'" *Ex parte Jimenez*, 364 S.W.3d 866, 876 (Tex. Crim. App. 2012) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985)). Courts balance three interests in determining whether the State must provide access to an expert: (1) the private interest that will be affected by the State's action; (2) the "governmental interest that will be affected if the safeguard is to be provided"; and (3) the "probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not protected." *Ex parte Jimenez*, 364 S.W.3d at 876 (citing *Ake*, 470 U.S. at 77). "This analysis is conducted with a view towards whether failing to provide the defendant with the expert help he claims is necessary creates 'a high risk of an inaccurate verdict.'" *Id.* (citing *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999)). An indigent defendant, however, is not "entitled to choose an expert of his own

personal liking or one who will agree with his defensive theory." *Id.* at 877 (citing *Griffith v. State*, 983 S.W.2d 282, 286 (Tex. Crim. App. 1998)); *see Griffith*, 983 S.W.2d at 286 (observing that "the purpose of the appointment is to level the playing field; to give a defendant access to a competent expert who can assist in the evaluation, preparation, and presentation of the defense").

In October 2015, the trial court approved appellant's three pre-trial requests for expert assistance, and one of the appointed experts was a forensic toxicologist.[2]  In his pre-trial ex parte motion, appellant's stated reason for the appointment of the forensic toxicologist was "to examine the evidence to include the lab results on the blood draw."  At the ex parte hearing during trial, appellant sought assistance from a different forensic toxicologist than the one that the trial court had already approved in October 2015.  Appellant also filed a motion for continuance shortly before the trial occurred, seeking more time to evaluate the pre-admittance records, but he does not challenge the trial court's ruling on the motion for continuance.  Appellant further did not reference or explain why the already approved forensic toxicologist was not capable of providing competent assistance concerning any effect that the pain medication and fluid might have had on him or on the blood alcohol test results.  *See Ex parte Jimenez*, 364 S.W.3d at 877 (observing that trial court may deny further expert assistance if court has already appointed expert and defendant requests different expert "unless the defendant proves that the original appointed expert could not adequately assist the defendant" and that "a defendant who relies on public funds for expert assistance must be satisfied with a competent expert"); *see also Busby*, 990 S.W.2d at 271 (concluding that trial court could have reasonably found that appointment of additional expert was unnecessary because already appointed

---

[2] The other two experts were an accident-reconstruction expert and a private investigator.

expert could adequately assist defendant). Appellant also failed to file a written motion for the appointment of an additional expert. *See Ex parte Jimenez*, 364 S.W.3d at 881 (stating that "indigent defendant will not be entitled to funding for experts absent adequate factual support in the written motion that he presents to the trial judge").

On this record, we cannot conclude that the trial court's denial of appellant's request for the appointment of an additional expert created "'a high risk of an inaccurate verdict.'" *See id.* at 876 (quoting *Busby*, 990 S.W.2d at 271). Thus, we conclude that the trial court did not abuse its discretion or violate appellant's due process rights by denying his request for the appointment of an expert. We overrule appellant's first issue.

**Admission of Evidence**

In his second issue, appellant challenges the trial court's admission of evidence regarding the average elimination rate for alcohol, arguing that it was not relevant. *See* Tex. R. Evid. 401. Specifically, appellant challenges the relevancy of the following testimony: (i) the emergency room physician's testimony that "the body processes alcohol 'at a rate of about 25 units per hour'" and that "most normal humans" excrete alcohol at about this rate, and (ii) the forensic scientist's testimony regarding "the absorption rate" and "the range of elimination rates reported for human beings," which is a decrease between .01 and .03 per hour. Appellant asserts that this evidence was irrelevant because the State did not offer testimony on retrograde extrapolation. *See Mata v. State*, 46 S.W.3d 902, 908–09, 916 (Tex. Crim. App. 2001) (describing science of retrograde extrapolation, which is "computation back in time of the blood-alcohol level—that is, the estimation of the level at the time of driving based on a test result from some later time").

7

**Standard of Review**

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). "An abuse of discretion does not occur unless the trial court acts 'arbitrarily or unreasonably' or 'without reference to any guiding rules and principles.'" *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Further, we may not reverse the trial court's ruling unless the determination "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see Henley*, 493 S.W.3d at 83 ("Before a reviewing court may reverse the trial court's decision, 'it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008))). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93.

**Relevance of Challenged Evidence**

"Evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010) (quoting *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004)). Here the evidence showed that appellant's blood sample was drawn approximately one hour after the accident, and the results from the blood alcohol testing showed a blood alcohol concentration over twice the legal numerical limit. Appellant does not dispute that the blood alcohol test results were admissible, *see id.* at 744–45 (observing court's prior holding that results of breath testing taken "75 minutes after driving" had "probative

8

value in proving both per se and impairment intoxication at the time of driving"). And the primary disputed fact of consequence was whether appellant was intoxicated at the time of the accident. The charge to the jury also included both statutory definitions of intoxication: (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol," and (2) "having an alcohol concentration of 0.08 or more." *See* Tex. Penal Code § 49.01(2).

In this context, the trial court could have reasonably determined that the evidence of the average elimination rate of alcohol was probative of a fact of consequence—that it was a piece in "the evidentiary puzzle for the jury to consider" in determining whether appellant was intoxicated at the time of the accident. *See Stewart*, 129 S.W.3d at 97; *see also id.* at 97–98 (concluding that breath test results were relevant and observing that jury did not have to determine defendant's exact blood alcohol concentration at time defendant was driving but only that it was over legal limit or that defendant failed to have normal use of mental or physical faculties because of introduction of alcohol in system); *Christ v. State*, No. 09-05-00291-CR, 2006 Tex. App. LEXIS 6585, at *8–10 (Tex. App.—Beaumont July 26, 2006, pet. ref'd) (mem. op., not designated for publication) (finding that testimony concerning test results from blood sample drawn over two hours after accident, including testimony about "general theory of human alcohol absorption and elimination rates," was relevant without evidence of retrograde extrapolation and holding that trial court did not abuse its discretion by admitting testimony).

**Rule 403 Analysis**

Appellant further asserts that, even if the evidence of the average elimination rate had some slight probative value, such value was substantially outweighed by the danger of unfair

9

prejudice. *See* Tex. R. Evid. 403. Appellant argues that the evidence "served only to invite the jurors to perform their own crude extrapolation calculations."

"[A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *see State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005) (discussing factors in rule 403 analysis). "[T]hese factors may well blend together in practice." *See Gigliobianco*, 210 S.W.3d at 642.

Considering the relevant factors, the trial court could have reasonably concluded that the probative value of the challenged evidence was not substantially outweighed by the danger of unfair prejudice. *See id.*; *Mechler*, 153 S.W.3d at 439 (observing that court has "long held that a trial court is entitled to broad discretion in ruling on a Rule 403 objection"). The evidence of the average elimination rate directly related to the offense of intoxication manslaughter and tended to make it more probable that appellant was intoxicated at the time of the accident—the central dispute at trial. The evidence gave context to the test results from appellant's blood sample that was drawn approximately one hour after the accident. *See Mechler*, 153 S.W.3d at 440–42 (concluding that evidence of intoxilyzer results was admissible without extrapolation testimony because "they tend

10

to make it more probable that [the defendant] was intoxicated at the time of driving under both the per se and impairment definitions of intoxication" and their probative value outweighed risk of unfair prejudice under rule 403). The testimony concerning the average elimination rate also was minimal. The emergency room physician's testimony on the subject covered about three pages of testimony and the forensic scientist's testimony on the subject covered about two pages of testimony.

Thus, we conclude that the trial court did not abuse its discretion in its rule 403 determination. *See Gigliobianco*, 210 S.W.3d at 642; *see also Stewart*, 129 S.W.3d at 97 (rejecting argument that admission of breath test results invited jury to engage in "its own crude retrograde extrapolation"); *Morales v. State*, No. 04-11-00363-CR, 2012 Tex. App. LEXIS 3634, *20–23 (Tex. App.—San Antonio May 9, 2012, no pet.) (mem. op., not designated for publication) (concluding trial court did not abuse its discretion in rule 403 determination and admission of evidence, including testimony of standard elimination rate of alcohol, without opinion evidence about "range of alcohol concentration at the time of driving" and observing that "admission of the blood test result did not necessarily encourage the jury to engage in its own crude retrograde extrapolation because, under the impairment definition of intoxication submitted to them, the jury did not need to establish [defendant]'s exact blood alcohol concentration at the time that he drove"); *Guardiola v. State*, No. 03-08-00399-CR, 2010 Tex. App. LEXIS 2071, at *11–13 (Tex. App.—Austin Mar. 23, 2010, no pet.) (mem. op., not designated for publication) (concluding that testimony about "alcohol absorption and elimination rates" was not improper retrograde extrapolation testimony and that trial court could reasonably have concluded that test results were not unfairly prejudicial).

**Harm Analysis**

Further, even if we were to conclude that the trial court erred by admitting evidence of the average elimination rate of alcohol, we would conclude that the error did not affect appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). The evidence of appellant's intoxication at the time of the accident was overwhelming. Although the total amount of alcohol that appellant consumed prior to the accident was not established definitively, witnesses testified that appellant consumed a large amount of alcohol in the hours immediately before the accident, the emergency room physician testified that the level of blood alcohol in a patient such as appellant was "an important number" because it was needed for treatment purposes, and the test results from appellant's blood sample were twice the legal numerical limit. *See* Tex. Penal Code § 49.01(2)(B).

Other evidence also supported a finding that appellant did not have the normal use of his mental faculties immediately before and at the time of the accident. *See id.* § 49.01(2)(A). Appellant was driving the wrong way on the highway at the time of the accident despite receiving numerous visible warnings not to do so. The evidence showed that appellant drove past multiple reflective signs warning "Wrong Way" and "Do Not Enter" while traveling the wrong way on the highway prior to the accident. A witness, who was a passenger in a vehicle that was traveling the correct way on a stretch of the highway close to the scene of the accident and shortly before the accident occurred, testified that his vehicle ended up in the grass on the side of the highway to avoid a collision with a motorcycle that had two people on it. He testified that the motorcycle was traveling in the wrong direction "coming at us in the same lane" and that the motorcycle did not appear to brake, take evasive action to avoid a collision, or stop after the near miss with the witness's

12

vehicle. Similarly the driver of the other vehicle involved in the head-on collision with appellant testified that he did not see appellant try to swerve or slowdown to avoid the accident.

Evidence further showed that appellant smelled of alcohol and was not coherent after the accident. Witnesses at the scene of the accident and the hospital testified that they smelled the odor of alcohol coming from appellant and that they could not understand him. For example, a volunteer firefighter at the scene of the accident testified that she could understand "[m]aybe about half of" what appellant was saying and that "[t]here was a distinctive and strong odor of metabolizing alcohol that was coming from his breath rather strongly." The emergency room physician at the hospital similarly testified about appellant's "odor of alcohol," "mumbling," inability to answer questions, and his lack of alertness. The physician also testified that he "would not expect someone to be confused or decreased in their level of alertness to the degree we saw" based on the dose of the pain medication given pre-admittance, described the dose to be "very small," and answered "No" when asked if, in his clinical practice, he had "found those lactate Ringer's to [have] interfered or affected the alcohol test that you [have] received."

Examining the record as a whole, we have fair assurance that any error in the admission of evidence about the average elimination rate of alcohol did not influence the jury or had but a slight effect. *See Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003) ("In considering non-constitutional error, an appellate court must disregard the error if the court, 'after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'"); *Armijo v. State*, No. 02-11-00430-CR, 2013 Tex. App. LEXIS 9667, at *11 (Tex. App.—Fort Worth Aug. 1, 2013, no pet.) (mem. op., not designated for publication) (holding

13

that "erroneous admission of the retrograde extrapolation testimony did not affect Appellant's substantial rights to a fair trial or substantially affect or in any way undermine confidence in the jury's verdict in the felony DWI case and was therefore harmless"). Thus, we conclude that any error in the admission of the challenged evidence was harmless.

Because we conclude that the trial court did not abuse its discretion in admitting the evidence of the average elimination rate and that, even if it did, such error did not affect appellant's substantive rights, we overrule appellant's second issue.

## CONCLUSION

Having overruled appellant's issues, we affirm the judgment of conviction.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Bourland

Affirmed

Filed: July 20, 2017

Do Not Publish